**<u>EXHIBIT 1</u>**

**CONFIDENTIAL - FILED UNDER SEAL**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NINE POINT ENERGY HOLDINGS, INC.<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-10570 (MFW)<br><br>(Jointly Administered) |
| NINE POINT ENERGY HOLDINGS, INC., and NINE POINT ENERGY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CALIBER MEASUREMENT SERVICES LLC, CALIBER MIDSTREAM FRESH WATER PARTNERS LLC, and CALIBER NORTH DAKOTA, LLC,<br><br>Defendants. | Adv. Proc. No. 21-50243 (MFW)<br><br>**Re: A.D.I.s 5, 6, and 7** |

## CALIBER'S OPPOSITION TO NPE'S FIRST MOTION FOR SUMMARY JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Curtis S. Miller (No. 4853)
Taylor M. Haga (No. 6549)
Nader A. Amer (No. 6635)
1201 N. Market St., 16th Floor
Wilmington, DE 19899-1347
Telephone: (302) 658-9200

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Perez (admitted *pro hac vice*)
Brenda L. Funk (admitted *pro hac vice*)
Tristan M. Sierra (admitted *pro hac vice*)
700 Louisiana, Suite 1700
Houston, TX 77022-2784
Telephone: (713) 546-5040

Edward Soto (admitted *pro hac vice*)
Lauren Alexander (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100

*Counsel to Caliber Measurement Services LLC, Caliber Midstream Fresh Water Partners LLC, and Caliber North Dakota LLC*

Dated: April 9, 2021

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nine Point Energy Holdings, Inc. (8331); Nine Point Energy, LLC (0717); Foxtrot Resources, LLC (6690); and Leaf Minerals, LLC (9522). The Debtors' address is 1001 17th Street, 14th Floor, Denver, Colorado 80202.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................3

    I.  The Previous Action ......................................................................................3

    II. The Amended Agreements ............................................................................5

ARGUMENT .............................................................................................................8

    I.  NPE Should be Judicially Estopped From Challenging the ██████ as Covenants Running With the Land Just Three Years After it Reaffirmed That They Were to Both Caliber and This Court ...................................................8

    II. The ████████ Are Covenants Running with the Land as a Matter of Law, or Alternatively, a Genuine Dispute of Material Fact Exists Such that Summary Judgment in Favor of NPE That They Are Not Is Inappropriate...................12

    *1. Legal Standard for Covenants Running with the Land Under North Dakota Law* ........12

    *2. The Parties Intended the ████████ to Run with the Land* ..........................13

    *3. Plaintiffs Dispute the Plain Language of the 2018 MSAs, So the First MSJ Should Be Denied Even Though the MSAs, and the Rights NPE Granted to Caliber Therein and in Connection Therewith, Include a Grant of Real Property Interests* ........14

    *4. NPE's Argument Regarding the Time and Manner of Conveyance and other Arguments Are Irrelevant* ........22

    *5. The ████████ Directly Benefit—Touch and Concern—NPE's Mineral Leases in the ████████* ........24

CONCLUSION..........................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alta Mesa*,
   613 B.R. .......................................................................................................... *passim*

*Armstrong v. Dakota W. Bank of Bowman (In re Arithson)*,
   175 B.R. 313 (Bankr. D.N.D. 1994) ....................................................................17

*Christman v. Emineth*,
   212 N.W.2d 543 (N.D. 1973) .........................................................................18, 19

*Chrysler Corp. v. Monroeville Dodge, Ltd. (In re Monroeville Dodge, Ltd.)*,
   166 B.R. 264, 269 (Bankr. W.D. Pa. 1994) ..........................................................12

*Cukierman v. Mechs. Bank of Richmond (In re J.F. Hink & Son)*,
   815 F.2d 1314 (9th Cir. 1987) .............................................................................13

*Eakman v. Robb*,
   237 N.W.2d 423 (N.D. 1975) ...............................................................................24

*Feland v. Placid Oil Co.*,
   171 N.W.2d 829 (N.D. 1969) ...............................................................................17

*Flying Diamond Oil Corp. v. Newton Sheep Co.*,
   776 P.2d 618 (Utah 1989) .........................................................................25, 32, 33

*Hunt Oil Co. v. Kerbaugh*,
   283 N.W.2d 131 (N.D. 1979) ...............................................................................18

*Kittleson v. Grynberg Petroleum Co.*,
   876 N.W.2d 443 (N.D. 2016) ...............................................................................17

*Kosel v. Stone*,
   404 P.2d 894 (Mont. 1965) ..................................................................................24

*Krenz v. XTO Energy, Inc.*,
   90 N.W.2d 22 (N.D. 2017) ...................................................................................17

*Miller v. Schwartz*,
   354 N.W.2d 685 (N.D. 1984) ...............................................................................17

*Monarch Midstream, LLC v. Badlands Energy, Inc. (In re Badlands Energy, Inc.)*,
   608 B.R. 854 (Bankr. D. Colo. 2019) .............................................22, 23, 25, 26

*Newco Energy v. Energytec, Inc. (In re Energytec, Inc.),*
    739 F.3d 215 (5th Cir. 2013) ................................................................. 21, 34-35

*Official Comm. of Unsecured Creditors v. Aust (In re Network Access Sols.,*
    *Corp.),*
    330 B.R. 67 (Bankr. D. Del. 2005) ..............................................................9, 11, 12

*Paul v. Monts,*
    906 F.2d 1468 (10th Cir.1990) ...........................................................................9

*Pickett v Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.),*
    304 B.R. 101 (Bankr. D. Del. 2004) ...............................................................10, 12

*Sanford v. Sanford,*
    301 N.W.2d 118 (N.D. 1980) ............................................................................17

*Self v. Sharafi,*
    220 Cal. App. 4th 483 (2013) ...........................................................................32

*Teledyne Indus., Inc. v. NLRB,*
    911 F.2d 1214 (6th Cir. 1990) ............................................................................9

*Triangle USA Petroleum Corp. v. Caliber Measurement Servs. LCC,*
    Case No. 16-51023 (Bankr. D. Del. 2016) ..........................................................1, 3

*Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.),*
    327 B.R. 719, 723 (Bankr. D. Del. 2005) .............................................................11

*Wayt v. Patee,*
    269 P. 660 (Cal. 1928) .....................................................................................24

*Wheeler v. Southport Seven Planned Unit Dev.,*
    821 N.W.2d 746 (N.D. 2012) ............................................................................14

**Statutes**

N.D.C.C. § 47-01-03 ..........................................................................................13

N.D.C.C. § 47-04-01 ..........................................................................................13

N.D.C.C. § 47-04-24 .....................................................................................14, 20

N.D.C.C. § 47–04–26 ....................................................................................14, 25

## PRELIMINARY STATEMENT

What's old is new again. Caliber[2] and NPE[3] already fought—both before this Court and in North Dakota state court—over whether ████████ of oil and gas mineral interests constituted covenants running with the land under North Dakota law. On the eve of a crucial summary judgment hearing in North Dakota state court, following months of litigation in both Delaware bankruptcy court and North Dakota involving significant briefing and depositions, the parties settled their dispute. Or so Caliber thought.

The parties then put that settlement before this very Court in order to resolve Caliber's proofs of claim in NPE's predecessor's bankruptcy, the motion to reject the Caliber agreements, the North Dakota action, and Caliber's appeal of the chapter 11 confirmation order. The Court entered an order approving an agreed stipulation premised entirely on a settlement agreement which incorporated the key terms agreed to by NPE including reaffirming, ratifying, and strengthening the previously agreed-to ████████ as covenants running with the land. Specifically, in the face of significant, hard-fought litigation among similarly-situated parties in the industry regarding similar ████████ as covenants running with the land, and actual litigation between Caliber and NPE on that very issue, NPE agreed with Caliber that the ████████ in their agreements were covenants running with the land. And NPE went even further, acknowledging that the essential elements of a covenant running with the land under North Dakota law were present such as horizontal privity and that the ████████████████ the Debtors' oil and gas leases. In fact, the stipulation presented to the Court by NPE, which was entered as an

---

[2] Caliber is defined as Caliber Measurement Services LLC, Caliber Midstream Fresh Water Partners LLC, and Caliber North Dakota LLC, together.

[3] NPE is defined as Nine Point Energy, LLC.

order by the Court, explicitly incorporated the settlement agreement which included the agreements that are the subject of this adversary proceeding.

But a mere three years after telling this Court that the ███████ were covenants running with the land, NPE has gone back on its word yet again and seeks this Court's countenance to do so. Not only should the Court refuse to sanction such inconsistencies, but it should judicially estop NPE from even taking the position. The law does not allow NPE to tell the Court one thing regarding the ████████ three years ago in order to achieve its desired ends, and then tell the Court the exact opposite three years later. This is particularly so after Caliber expressly relied on those representations in making economic concessions and giving up valuable rights in the form of its proofs of claim and litigation rights in North Dakota and in this district.

Such duplicity should not be rewarded, but in any event, NPE is not entitled to summary judgment. The ████████ always have, and continue to be, covenants running with the ████████ ████████ that Debtors now intend to sell. Of the three factors to establish a covenant running with the land under North Dakota law, NPE does not even contest the first—that the parties intended the Dedications to run with the land. At the same time that NPE created the covenant known as the ████████ NPE transferred to Caliber certain rights in real property ████████████████ ██████████████████████████ that it held via its mineral leases. NPE conveyed certain of those valuable property rights to Caliber in order to induce Caliber to construct a custom gathering system costing hundreds of millions of dollars to support the production of oil and gas form the Debtors' oil and gas leases in the mineral estate. As such, the ████████ also clearly ████████████ the land by burdening such estate. Under North Dakota law, then, the ████████ are covenants that run with the land. For this and other reasons set forth below,

2

*Plaintiffs' Motion for Partial Summary Judgment* (A.D.I. 6) (the "<u>First MSJ</u>"), dated March 16, 2021, should be denied.

<b><u>STATEMENT OF FACTS</u></b>

**I.      <u>The Previous Action</u>**

More than four years ago, after filing for chapter 11 protection, TUSA filed an adversary proceeding[4] against Caliber seeking a declaratory judgment that the following agreements, in relevant part, do not contain covenants running with the land: "[A] certain amended and restated Midstream Services Agreement, dated September 12, 2013, between TUSA, as producer, and Caliber North Dakota LLC ("<u>Caliber North Dakota</u>"), as gatherer, as amended by Amendment No. 1 thereto, dated June 16, 2015," (the "<u>2013 Gas and Water MSA</u>"), attached hereto as **<u>Exhibit A</u>**; a "certain amended and restated Midstream Services Agreement (Crude Oil), dated September 12, 2013, between TUSA, as producer, and Caliber North Dakota, as gatherer, as amended by Amendment No. 1 thereto, dated June 16, 2015," (the "<u>2013 Crude Oil MSA</u>") (together, the "<u>2013 MSAs</u>"), attached hereto as **<u>Exhibit B</u>**; a "certain Gathering Services Agreement (LACT Units), dated September 12, 2013, between TUSA, as producer, and Caliber Measurement" (the "<u>LACT Agreement</u>"). Compl. For Decl. J. ¶¶ 15(a)-(f), Previous Action, D.I. 3 (the "<u>Previous Action Complaint</u>").

Once the Court dismissed the Previous Action, the first-filed, then-pending North Dakota State Court action between Caliber, as Plaintiff, and TUSA, as Defendant, Civil Case No. 27-2016-CV-00218 (the "<u>Original North Dakota Action</u>"), seeking a declaratory judgment that the ███████ in the 2013 Gas and Water MSA and 2013 Crude Oil MSA were enforceable covenants running with the land, proceeded. The parties (now NPE following confirmation of

---

[4] *Triangle USA Petroleum Corp. v. Caliber Measurement Servs. LCC*, Case No. 16-51023 (Bankr. D. Del. 2016) (the "<u>Previous Action</u>").

3

TUSA's chapter 11 plan) engaged in document and deposition discovery. Following the close of discovery, the parties cross-moved for summary judgment on the issue of whether the ███████ in the 2013 MSAs constituted covenants running with the land under North Dakota law. On the day before that crucial summary judgment hearing—regarding the very issue before the Court in the First MSJ—NPE and Caliber North Dakota (among other Caliber-related entities), entered into a letter of intent (the "LOI"), with an attached term sheet (the "Term Sheet"), laying out the parameters of a settlement agreement between them. *See* Dec. 7, 2017 LOI, attached hereto as **Exhibit C**.

In the LOI Term Sheet, the very first term that the parties agreed to include in the revised MSAs was titled ███████████ and stated that the settlement would have "███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████ Ultimately, the LOI and Term Sheet led to a formal settlement agreement between Caliber and NPE on January 1, 2018 (the "Settlement Agreement"), attached hereto as **Exhibit D**.

Based on the Settlement Agreement, the parties returned to the Court seeking approval of a stipulation resolving: (i) Caliber's proofs of claim, (2) TUSA's motion to reject the Agreements, (iii) Caliber's North Dakota Action, and (iv) Caliber's appeal of the confirmation order. *See* Previous Action, D.I. 984 (the "Stipulation"). Relying on the parties' representations in the Stipulation, the Court entered an order approving the Stipulation. *See* Previous Action, D.I. 1007 (the "Order"). The Order authorized and empowered the Debtors in the Previous Action to take all actions necessary to implement the relief granted in it and the Court retained jurisdiction for itself

with respect to all matters arising from or related to the implementation, interpretation, or enforcement of the Order. *See id*. ¶¶ 2-3.

The Stipulation was attached to the Order as Exhibit 1. *See* Previous Action, D.I. 1007-1. In that Stipulation, after setting forth the history of the parties' dispute and actions taken in both this Court and the North Dakota state court, the parties informed the Court of the LOI and stated that they had "engaged in good-faith settlement discussions among themselves and through their respective counsel, to enter into amended and restated versions of" the 2013 MSAs as set forth below. *See id*. at 5. Pursuant to the Stipulation: (1) the parties released each other from certain claims, (2) Caliber withdrew its proofs of claim, (3) the motion to reject was withdrawn with prejudice, (4) the amended Caliber contracts were deemed assumed pursuant to section 365 of the Code as required under a provision of the TUSA plan, and (5) the Caliber North Dakota Action and confirmation appeal were dismissed. *See id*. at 6-8. The Stipulation also attached the Settlement Agreement as Exhibit A, which was incorporated in the Court's Order. *Id*. at 8.

The Settlement Agreement, in turn, had attached to it Exhibits A, B, and C, which were forms of the Second Amended and Restated Crude Oil MSA, Gas & Water MSA, and LACT Agreement, each of which was to be entered into by the parties contemporaneously with the Settlement Agreement. *See* Settlement Agreement § 4.01.

## II.    The Amended Agreements

Pursuant to the Settlement Agreement NPE, as successor in interest to TUSA, and Caliber North Dakota subsequently entered into a Second Amended and Restated Midstream Services Agreement, dated January 1, 2018 (the "Second Amended Gas and Water MSA") (attached as Exhibit B to NPE's *Complaint for Declaratory Judgment* (D.I. 2) (the "Complaint")), a Second Amended and Restated Midstream Services Agreement (Crude Oil), dated January 1, 2018 (the "Second Amended Crude Oil MSA") (attached as Exhibit C to the Complaint) (together with the

5

Second Amended Gas and Water MSA, the "2018 MSAs"), and an amendment, Amendment No. 1, to the NGL Handling Agreement. Complaint at ¶¶ 24(a), (b), (e). NPE and Caliber Measurement, via "that certain Amended and Restated Gathering Services Agreement, dated January 1, 2018" also amended the LACT Agreement (the "Amended LACT Agreement"). *Id.* ¶ 24(d).

The 2018 MSAs contain a set of recitals at the beginning. Recital F, in line with the parties' LOI, Term Sheet, and Settlement Agreement, provides that " █████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████ And to erase any doubt, the 2018 MSAs include substantively similar ████████ ███████████████████████████████████████████████████ █████████████████████████████████████ that were present in the prior iterations of the MSAs. *Compare* 2013 MSAs (Exs. A and B) *with* 2018 MSAs § 10.1(a).

The 2018 MSAs also include provisions providing that each of NPE's ████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ 2018 MSAs § 10.1(a)(iii).

Following the parties' dispute in the Previous Action, and to make it clear that the 2018 █████████████████████████████████████ the 2018 MSAs specifically provide that the █████ ███████████████████████████████████████████████████ ████████ 2018 MSAs § 10.1(a)(iii). These provisions were not in any prior iteration of the

substantively similar contracts and were an expression by the parties to remove any doubt as to the

████████████████████████████████████████████ The parties further agreed that the

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████ 2018 MSAs § 10.1(a)(iii).

As yet further evidence of the parties' intent that ████████████████████████

███████████████, the 2018 MSAs, like the prior iterations, obligated NPE, as Producer, to

████████████████████████████████████████████████████████████████

██████████████████████████ 2018 MSAs § 10.1(a)(iv). Additionally, the 2018

MSAs required the Parties to ████████████████████████████████████████████

███████████████████" of the 2018 MSAs and to ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████ and in fact did (*see* Memorandum of Second Amended and Restated Midstream

Services Agreement, attached as **Exhibit E**, and Memorandum of Amended and Restated

Midstream Services Agreement (Crude Oil), attached as **Exhibit F**), record in the public records.

2018 MSAs § 10.1(a)(v).

In Section 14 of the 2018 MSAs, NPE makes it clear ████████████████████████

████████████████████████ In Section 14.1, the 2018 MSAs ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████" *Id*. § 14.1. Section 14.1 further

provides that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

███ .

## **ARGUMENT**

NPE would lead this Court to believe that although it explicitly contracted that the ████████ e covenants running with the land and then reaffirmed the ██████ as covenants running with the land in front of this Court, the ████████ do not actually run with the land. NPE is wrong.

**I.     NPE Should be Judicially Estopped From Challenging the ████████ as Covenants Running With the Land Just Three Years After it Reaffirmed That They Were to Both Caliber and This Court**

It is important to fully grasp the audacity of the Debtors' motion to reject and the legal positions it is taking in the Complaint and the First MSJ. Throughout these filings, NPE treats contract terms twice-agreed to by sophisticated parties, even those terms provided to this Court for approval, as mere suggestions. They are not.

NPE should be judicially estopped from arguing that the ████████ are not covenants running with the land under North Dakota law. "Judicial estoppel precludes a party from obtaining relief under one theory and later taking a contradictory position." *Official Comm. of Unsecured Creditors v. Aust (In re Network Access Sols., Corp.)*, 330 B.R. 67, 77–78 (Bankr. D. Del. 2005) (citing *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) ("'The basic principle ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'") (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (1981)).[5]

---

[5] *See also Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1217–18 (6th Cir. 1990) ("Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through

Courts typically utilize a non-exhaustive list of factors when determining when to employ judicial estoppel. First, a party's subsequent position must be clearly inconsistent with its earlier position. Second, the party must have succeeded in persuading a court to accept the earlier position, so that acceptance of the subsequent inconsistent position in a later proceeding would lead one to believe that the court has been mislead in either one of those positions. That is, judicial estoppel is unwarranted unless the party changed its position in bad faith. Third, the party arguing the inconsistent position would receive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Pickett v Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.)*, 304 B.R. 101, 109 (Bankr. D. Del. 2004) (internal citations omitted), *subsequently aff'd,* 233 F. App'x 115 (3d Cir. 2007). Here, judicial estoppel prevents NPE from seeking to reject the 2018 MSAs based on the position that the ███████ are not covenants running with the land.

First, NPE's current position in the First MSJ is clearly inconsistent with its earlier position in the Stipulation, which incorporated the Settlement Agreement and the 2018 MSAs. Collectively, those documents expressed NPE's agreement that the ███████ were covenants running with the land and that the various elements for such covenants under North Dakota law, as further detailed below (*see* Sec. II *infra*), were present. It is inconsistent for NPE to deny that the ███████ are covenants running with the land (*see* First MSJ at 1-2), that horizontal privity does not exist (*see id*. at 11-20), and that the ███████ do not touch and concern the land (*see id*. at 20-25), after previously agreeing with Caliber, and telling this Court that they did.

Second, NPE succeeded in persuading this Court to accept its earlier position when it came to this Court and sought its approval of the Stipulation. That Stipulation set forth the bargained-

---

cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment."); *Paul v. Monts*, 906 F.2d 1468, 1473 (10th Cir.1990) ("A litigant is required to be consistent in his conduct. He may not maintain a position regarding a transaction wholly inconsistent with his previous acts in connection with that same transaction.").

for compromise between Caliber and NPE regarding their long-running, hard-fought dispute as to the very issue of the ██████ as covenants. As a result of that compromise, as set forth in the Settlement Agreement and the 2018 MSAs (all of which were expressly incorporated into the Stipulation) the Court entered an Order approving the Stipulation. In so doing, the Court adopted NPE's express agreement that the ██████ were covenants running with the land.

Third, NPE would receive an unfair advantage to Caliber's detriment if not estopped from changing its position regarding the ██████ as covenants. In the words of this Court in *Network Access*, "[b]y supporting the [Stipulation], [NPE] was able to reap the advantage of" the benefits it obtained in the 2018 MSAs (including ██████) as well as the Revenue Commitment Agreement (including a ██████), in addition to receiving certainty and finality regarding the Caliber proofs of claim, the Caliber North Dakota Action, and Caliber's appeal of the confirmation order. *In re Network Access*, 330 B.R. at 78. "Having reaped this advantage, [NPE] cannot now seek to destroy the incentives offered to [Caliber]," including, most critically, NPE's reaffirmation and ratification of the ██████ as covenants running with the land. *Id*. Caliber would not have agreed to the Settlement Agreement embodied in the Court-approved Stipulation without NPE's agreement on the status of the ██████.

Bankruptcy courts in this Circuit, including this one, have judicially estopped debtors from taking similarly inconsistent positions after they successfully engaged the apparatus of the bankruptcy court to obtain desired relief or outcomes. For example, in *Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.)*, this Court found that the debtors there were barred by the doctrine of judicial estoppel from asserting that two agreements and payments made under them should be voided as constructively fraudulent. 327 B.R. 719, 723 (Bankr. D. Del. 2005). The debtor's "present argument that the Original and First Agreements should be voided as

constructively fraudulent transfers is inconsistent with the success it achieved in convincing the Court earlier that the assumption of the First Agreement (and concomitant settlement of claims arising out of the Original Agreement) was in the best interest of [debtor] and its creditors." *Id*. Likewise, NPE's present argument that the ███████ are not covenants running with the land is inconsistent with the success it achieved in previously convincing the Court that the settlement (including the concessions and representations that the ██████ were covenants running with the land) and release of claims arising out of the Agreements were in the best interests of the Debtors' estate. "Since it was successful in the prior action," in obtaining the Order it desired that resolved all then-outstanding claims with Caliber, "judicial estoppel precludes" NPE "from now asserting that the" ███████ are not covenants running with the land. *Id*.

Similarly, in *Chrysler Corp. v. Monroeville Dodge, Ltd. (In re Monroeville Dodge, Ltd.)*, the court applied judicial estoppel to prevent the debtor from contending that assumption of an agreement had been economically burdensome to the estate after assuring the court at a prior hearing on a motion to assume that agreement that assumption would impose no such burden. 166 B.R. 264, 269 (Bankr. W.D. Pa. 1994). Like here, the court had entered an order accepting the debtor's representation and approved the order based on it. *Id*. In language equally applicable here, the Court found that the "Debtor previously said one thing in persuading this court to grant its motion [] and asserts something to the contrary now that [contractual counterparty] seeks to enforce a provision of the contract that debtor sought permission to assume. Debtor cannot have it both ways. It is 'playing fast and loose' with the court in so doing and therefore shall be judicially estopped." *Id*.

"The judicial estoppel remedy is an equitable remedy which is triggered when there is a sense of fundamental unfairness." *In re Integrated Health*, 304 B.R. at 110. It would be

11

fundamentally unfair to allow NPE to now argue that the ▮▮▮▮▮ are not covenants running with the land after contractually agreeing that they were and that all required legal elements were present. Indeed, the parties engaged in significant litigation on the issue (as did the industry at large) and were not naïve as to the effect of the words in the 2018 MSAs. The words were carefully chosen and negotiated and had the agreed effect of establishing the ▮▮▮▮▮ as covenants running with the land. NPE did not merely contract with Caliber as to this critical point; it engaged the apparatus of the Court to obtain its approval and adoption of the point in order to obtain for itself valuable relief. "The notion that a party in bankruptcy can be permitted to thwart a bankruptcy order which has been conceived and fostered through its participation has been vigorously rejected." *Cukierman v. Mechs. Bank of Richmond (In re J.F. Hink & Son)*, 815 F.2d 1314, 1318 (9th Cir. 1987) (citation and internal quotation marks omitted). Accordingly, NPE should be barred under the doctrine of judicial estoppel from now challenging the ▮▮▮▮▮ status as covenants running with the land after successfully representing to this Court that they were.

II.    **The ▮▮▮▮▮ Are Covenants Running with the Land as a Matter of Law, or Alternatively, a Genuine Dispute of Material Fact Exists Such that Summary Judgment in Favor of NPE That They Are Not Is Inappropriate**

      *1.    Legal Standard for Covenants Running with the Land Under North Dakota Law*

The parties agree North Dakota law governs real property located within the state. N.D.C.C. § 47-04-01. The North Dakota Century Code defines real property as follows:

> Real or immovable property consists of: 1. Land; 2. That which is affixed to land, including manufactured homes as defined in section 41-09-02 with respect to which the requirements of subsection 6 of section 47-10-27, as applicable; 3. ***That which is incidental or appurtenant to land***; and 4. That which is immovable by law.

N.D.C.C. § 47-01-03 (emphasis added). The North Dakota Century Code defines covenants running with the land as follows:

> Certain covenants contained in grants of estates in real property are appurtenant to such estates and pass with them so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them. Such covenants are said to run with the land.

N.D.C.C. § 47-04-24. The North Dakota Century Code identifies specific covenants running with the land as follows: "All covenants contained in a grant of an estate in real property, which are made for the direct benefit of the property or some part of it then in existence, run with the land."

N.D.C.C. § 47-04-26; *Wheeler v. Southport Seven Planned Unit Dev.*, 821 N.W.2d 746, 753 (N.D. 2012). Taken together, for a covenant to run with the land under North Dakota law:

a.   **Intent**: The parties must intend for the covenant to bind successors and assigns;

b.   **Privity**: The covenant must be contained in a grant of an estate in real property; and

c.   **Touch and Concern**: The covenant must "directly benefit" or burden the land.

The ▆▆▆▆ in the 2018 MSAs satisfy those requirements and are, therefore, covenants running with the land. ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆ (*see* 2018 MSAs §§ 10.1(a)(iii), 14.1), NPE however contends that the language in the 2018 MSAs doesn't mean what it says and that Plaintiffs' real property interests have not been conveyed.  First MSJ at 9. Accordingly, the First MSJ should be denied so that the parties may conduct further discovery, conduct further briefing and proceed to trial before this Court, should the disputed facts remain unresolved. In the alternative, NPE's First MSJ should also be denied because the 2018 MSA's are unambiguous in supporting that the ▆▆▆▆ are covenants running with the land.

> 2.   *The Parties Intended the* ▆▆▆▆ *to Run with the Land*

There is no dispute that both Caliber and NPE intended the ▆▆▆▆ to be covenants running with the land under North Dakota law. That was true since the beginning of Caliber and NPE's relationship. Under the language of the 2013 MSAs, to which TUSA and Caliber were

parties, Section 10.1 explicitly demonstrates ████████████████████████████

████████████████████████████████████ *See* Exs. A and B at § 10.1 ("██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████).

    In the 2018 MSAs, NPE's intention for the ██████████ to run as covenants with the land

was made even clearer. NPE—in the face of contentious litigation with Caliber as to whether the

original ██████████ constituted covenants running with the land and with knowledge of other

E&P debtors engaging in similar disputes with their midstream servicers at the time—not only

retained the thrust of the original language, but added that ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

2018 MSAs § 10.1(a)(iii) (emphases added).

    Because the parties intended the ██████████ to run as covenants with the land, the first

requirement under North Dakota law is met.

    *3.    Plaintiffs Dispute the Plain Language of the 2018 MSAs, So the First MSJ Should Be Denied Even Though the MSAs, and the Rights NPE Granted to Caliber Therein and in Connection Therewith, Include a Grant of Real Property Interests*

    Contrary to NPE's contention (First MSJ at 11-16), the ██████████ were made in

conjunction with a grant of an estate in real property. NPE's primary argument[6] on this point

---

[6] As a secondary argument, NPE seems to contend that Caliber is arguing that the ██████████ of NPE's real property interests in the ██████████ themselves constitute that grant of an estate in real property. *See* First MSJ at 11-

appears to be that because "[t]he only 'estate in real property'" it possesses is the "mineral estate," and because Caliber was not conveyed title to any portion of that mineral estate in the 2018 MSAs, no conveyance of an estate in real property occurred. *See* First MSJ at 13. At a minimum, the First MSJ should be denied because there is a genuine dispute of material fact regarding what was and was not conveyed to Caliber.  NPE's argument that Caliber never received an assignment of the mineral estate – represented by NPE's oil and gas leases – is contrary to the plain language of the 2018 MSAs.  2018 MSAs at 14.1 ("██████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████).  This conflict should be resolved following discovery and through testimony at trial in this matter, thus, the First MSJ should be denied.  In the alternative, Caliber contends that the plain language of the 2018 MSAs, including that ████████████████████████████████████████████████

████████████████████████████████, also warrants dismissal of the First MSJ.

First, a little background on North Dakota oil and gas law. "'Oil and gas leases are interests in real property in North Dakota.'" *Kittleson v. Grynberg Petroleum Co.*, 876 N.W.2d 443, 450 (N.D. 2016) (quoting *Nantt v. Puckett Energy Co.*, 382 N.W.2d 655, 659 (N.D. 1986)); *see also Armstrong v. Dakota W. Bank of Bowman (In re Arithson)*, 175 B.R. 313, 322 (Bankr. D.N.D. 1994) ("Similarly, a landowner's mineral estate or interest in unextracted oil and gas, even when split away from the surface estate, is an interest in real estate and governed by the law of real estate mortgages."). "The interest conveyed to the lessee under an oil and gas lease is known as a working

---

12. Caliber is making no such argument and, as such, the cases NPE cites for that proposition are irrelevant. *See id*. at 12 (citing *In re Sabine, Grand Mesa*, and *Elevation*).

interest… The working interest and royalty interest are both interests in real property." *Kittleson*, 876 N.W.2d at 450 (citing *Corbett v. La Bere,* 68 N.W.2d 211, 213-14 (N.D. 1955)). "A 'working interest' has also been defined as '[t]he operating interest under an oil and gas lease. The owner of the working interest has the exclusive right to exploit the minerals on the land.'" *See Miller v. Schwartz*, 354 N.W.2d 685, 689 (N.D. 1984) (quoting H. Williams and C. Meyers, Oil and Gas Law, Manual of Terms, pp. 838-838.1 (1982)).

North Dakota courts and those across the country are in agreement that NPE's oil, gas, and/or mineral leases (its "working interests") are composed of a bundle of property right sticks— the traditional imagery of property law—including the rights to: (1) explore for oil and gas on and under particular land, (2) produce oil, gas, and saltwater from that land, (3) transport produced oil, gas, and saltwater off that land, and (4) make reasonable use of the surface of the land for said exploration, production, and transportation. *See, e.g., Sanford v. Sanford*, 301 N.W.2d 118, 122 (N.D. 1980) ("The bundle of rights theory of appraisal holds that the ownership of real property may be compared to a bundle of sticks wherein each stick represents a separate right or privilege of ownership."); *Krenz v. XTO Energy, Inc*., 90 N.W.2d 22, 236-39 (N.D. 2017); *Feland v. Placid Oil Co.*, 171 N.W.2d 829, 834 (N.D. 1969); *see also* Kirk B. Burkley, Navigating Oil and Gas Lease Issues, Am. Bankr. Inst. J. 18 (2011) ("[A]n an oil and gas lessor's rights come in three general parts. First, the company is to have the exclusive right to search for oil and gas underlying the leased premises. Next, the company has the right to enter the property-owner's lands to conduct drilling operations for the purpose of producing oil and gas from the leased premises. Lastly, [] the lessee has the right to transport the oil and gas by pipeline across the subject property.").

Under North Dakota law, the "fourth" stick of the mineral estate—reasonable use of the surface—has been further described as follows:

> [T]he lessee, in developing the leased premises, is entitled to use of the land
> reasonably necessary in producing the oil. Whether the express uses are set out or
> not, the mere granting of the lease creates and vests in the lessee the dominant estate
> in the surface of the land for the purposes of the lease; by implication it grants the
> lessee the use of the surface to the extent necessary to a full enjoyment of the grant.
> Without such use, the mineral estate obtained under the lease would be worthless.

*Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 135 (N.D. 1979) (citations omitted); *see also*

*Christman v. Emineth*, 212 N.W.2d 543, 550 (N.D. 1973) ("[U]nless the language of the

conveyance repels such a construction, as a general rule a grant of . . . minerals gives to the owner

of the minerals the incidental right of entering, occupying, and making such use of the surface

lands as is reasonably necessary in exploring, mining removing, and marketing the minerals.")

(citation omitted).

Turning to the language of the 2018 MSAs, it is precisely these real property rights—a

portion of NPE's mineral interest estate—to use the surface in order to transport minerals off of

the land that was assigned and granted to Caliber. Section 14.1 of the 2018 MSAs ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████     The 2018 MSAs go on to indicate that Caliber was granted "████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*

This is no different than the process by which NPE acquired its real property rights—a working interest (i.e., lease)—in the mineral interests located on the Dedicated Properties. Prior to severance of the mineral estate from the surface estate, the original owner of the estate in real property owned both the right to occupy and possess the land, but also the rights to explore, produce, transport, and make reasonable use of the surface to effectuate such rights—i.e., the four sticks in the bundle of property rights. Upon severance of the mineral estate and conveyance of it to another party, the original property owner lost those four sticks in the bundle of property rights that he or she originally possessed in conjunction with the surface rights. And, critically, a new estate in real property was created by the severance of the mineral interests. A smaller estate was created out of a larger one.

The same thing happened upon the execution of the 2018 MSAs with Caliber. In fact, NPE's property rights are actually a lease of the mineral interest. In the words of NPE "'[t]he only estate in real property' that [Mineral Estate Owner] possess[ed], and so could have granted, is the mineral estate," (First MSJ at 13) and yet the Mineral Estate Owner conveyed to NPE a working interest (lease) that NPE necessarily concedes is an estate in real property. The original property owner's property rights and estate were reduced when it severed the mineral interests, the mineral interest owner's property rights and estate were reduced when it granted NPE a working interest (an estate), and NPE's working interest rights were similarly reduced when NPE conveyed two of its property rights sticks, the right to transport minerals and access the surface to do so, to Caliber. This conveyance of two valuable property rights, without which NPE's remaining property rights in its working interests would be essentially valueless, constitutes a grant of an estate in real property to Caliber. So the mere fact that NPE specifically reserved the rights to decide where and whether to drill on the ████████████ (if at all) and to operate the wells thereon does not

"[c]onfirm that Plaintiffs did not grant an estate in real property," because those retained rights simply became the new estate in real property NPE created in conveying the rights it no longer possessed to Caliber.

Nevertheless, NPE argues that even these conveyances of an estate in real property in the form of easements and rights-of-way are insufficient for a covenant because they are appurtenant to the surface estate while the ██████ relate to the mineral estate. *See* First MSJ at 14. NPE then cites a few cases that drew a similar distinction. *See id*. But based on North Dakota law and the plain language of the 2018 MSAs, this argument is incorrect and the cases are inapplicable. Instead, Caliber has real property rights appurtenant to the mineral estate.

As the Bankruptcy Court for the Southern District of Texas explained in *Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC* (*In re Alta Mesa Resources, Inc.*), "the surface easement logically connects with and burdens [Producer]'s real property." 613 B.R. 90, 104 (Bankr. S.D. Tex. 2019) (citing *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 224-25 (5th Cir. 2013) (finding pipeline right of way burdened underlying property); *Sw. Pipe Line Co. v. Empire Nat. Gas Co.,* 33 F.2d 248, 252 (8th Cir. 1929) (rejecting argument that gas purchase agreement did not create interest in land because "agreement created an easement for the buyer to build gathering pipelines, giving the buyer 'some interest in the leasehold binding on the assignee thereof with notice'")). In a passage equally applicable here explaining the necessary connection between a producer's mineral leases and the surface easements, the *Alta Mesa* court disposed with the notion that an easement conveyed by a producer somehow did not relate to that producer's mineral lease interest:

> [Producer]'s leases grant it easements to develop hydrocarbons. The gathering agreements carve out a portion of [Producer]'s lease easements and grant those portions to [Gatherer]. This reduces [Producer]'s real property interest under the leases. Contrary to the holding in *Sabine*, the surface easements directly affect the

19

lessee's underlying mineral interest. The *Sabine* court found that a surface easement does not touch and concern the mineral estate because the surface and mineral estates consist of separate bundles of sticks. 550 B.R. at 66-67. However, in the context of an oil and gas lease, the surface easement is integral to the lessee's ability to realize the value of its mineral reserves. Without the surface easement, the lessee cannot capture reserve hydrocarbons. The covenants granting [Gatherer] surface easements directly burden [Producer]'s interest in the reserves because they restrict [Producer]'s use of the surface land for drilling or exploration.

*Id*. at 104. The *Alta Mesa* court, in finding that a substantively similar ███████ was a covenant running with the land under Oklahoma law, went on to fully dispose of NPE's argument that the conveyance of an easement in a midstream gathering contract "cannot serve as the required grant of an estate," (First MSJ at 15 citing *Sabine*). 613 B.R. at 102 ("To the extent that the pronouncements in Sabine were intended to be generalized, this Court must reject them."). Oklahoma law on covenants is substantively identical to North Dakota's. *Compare* N.D.C.C. § 47-04-24 ("Certain covenants contained in grants of estates in real property are appurtenant to such estates and pass with them so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them. Such covenants are said to run with the land.") *with In re Alta Mesa*, 613 B.R. at 100 (citing *Beattie v. State ex rel. Grand River Dam Auth.*, 41 P.3d 377, 386 (Okla. 2002) (Opala, J., concurring) ("Real property covenants are those that are so connected to the underlying land that the benefit and burden pass to successors by operation of law.")). Like the three elements set forth above for a covenant under North Dakota law—intent, touch and concern, and privity—"[t]hree elements are required to form a real property covenant: 1) the burden or benefit must 'touch and concern' the land; 2) privity of estate must be present between 'the party claiming the benefit and the party upon whom the burden rests;' and 3) the parties forming the covenant must intend for the burden to pass to successors." *Id*. (citing *Beattie*, 41 P.3d at 387).

The *Alta Mesa* court then examined whether there was privity between the parties as the debtors there argued there was not, just as NPE does here. *Id*. at 105. As to horizontal privity, the court noted that while "[h]istorically, 'horizontal privity existed only if the covenantor and covenantee created the covenant in connection with a conveyance of an estate from one to the other," such as the "conveyance of a fee simple estate … conveyances of lesser estates have also been found sufficient." *Id*. (citation omitted) After acknowledging that the parties disputed whether horizontal privity was required under Oklahoma law, the Court found that it did not have to decide the issue because horizontal privity existed even if it was required. *Id*. Specifically, the Court stated that "[h]orizontal privity arises when the covenant is created in conjunction with a conveyance of an estate in property"—the very conception NPE advocates for here (see First MSJ at 11, 16). *Id*. at 106. The court found such a conveyance because the gathering agreements in *Alta Mesa*, like the 2018 MSAs here, ███████████████████████████████████████████████

███████████████████ *Id*. at 106. Rejecting the argument NPE makes here, that somehow the entire mineral estate must be conveyed for a valid covenant, the Alta Mesa court held that "[a]lthough less than a fee simple estate, the easements conveyed to [Gatherer] a possessory interest in the leasehold estate," and such "surface easement[s] [were] integrally tied to the purpose of an oil and gas lease." *Id*. The conveyance of the easements to the gatherer were enough to show horizontal privity with respect to the gathering agreements. *Id*.

The easements found by the *In re Alta Mesa* court to satisfy the horizontal privity requirement are substantively identical to those provided by NPE to Caliber here. *See* 2018 MSAs §§ 14.1. In the *Alta Mesa* midstream gathering agreements, the producer pledged to convey or assign to the midstream gatherer "any easement or rights-of-way for purposes of constructing,

owning, operating, repairing, replacing, and maintaining any portion of the [] Gathering System." *Id* at 96. NPE ███████████. *See* 2018 MSAs §§ 14.1.

Other bankruptcy courts have likewise rejected the argument made by NPE when faced with similar ██████ in midstream contracts that the debtors also sought to reject upon the contention that they did not contain covenants running with the land. *See Monarch Midstream, LLC v. Badlands Energy, Inc. (In re Badlands Energy, Inc.)*, 608 B.R. 854 (Bankr. D. Colo. 2019). The *Badlands* court, tasked with determining whether a similar midstream █████ was a covenant under Utah law, distinguished *Sabine*, and held that a natural gas gathering agreement may run with the land in Utah. *Id*. In so holding, the *Badlands* court disagreed with *Sabine's* privity analysis that NPE so heavily relies on, and found that the grant of a surface easement to a gatherer like Caliber was a conveyance creating privity with an oil and gas lessee like NPE. *Id*. at 874 ("Here, unlike in *Sabine*, the covenants burden Producers' real property interests ... in the context of a simultaneous conveyance of real property interests ... to [the gatherer], both of which are located in the same geographic area."); *see also id*. 873 (finding privity was present between E&P debtor and midstream provider creditor because "the parties simultaneously own property interests – Monarch's Gathering and Saltwater Disposal Systems and easements and Producers' easements and interests in the Leases and the Dedicated Reserves – on the same land."). Accordingly, NPE and Caliber are in privity and the second element for a covenant under North Dakota law is satisfied.

4.    *NPE's Argument Regarding the Time and Manner of Conveyance and other Arguments Are Irrelevant*

Based on the language of the 2018 MSAs, ████████████████████████ ████████████████████ 2018 MSAs 14.1.  Accordingly, the ██████ were covenants running with the land in 2012 and 2013 just as they are covenants

running with the land today.  NPE's argument of a supposed mismatch between the ██████

and the granting of an easement to Caliber is unavailing. *See* First MSJ at 16. While it is true that

Section 14.1 ████████████████████████████████████████████████████████████

████████████████████████████████████████████████ That is enough. *See In re*

*Badlands*, 608 B.R. at 874 ("Moreover, the GPA granted Monarch a floating easement across the

Leases and lands in which Producer may have an interest. These same Leases subject to the

easement are interests within the AMI, also subject to the ████████. Therefore, the easement and

████████ are conveyances that simultaneously burden the same real property interest.") (citations

omitted).

NPE next argues that if the ████████ (as covenants) could constitute the required "grant

of an estate" hypothetically, such ████████ were not such a grant of an estate to Caliber. *See*

First MSJ at 16-20. Because Caliber does not contend that the ████████ themselves are the

property interests conveyed to Caliber, NPE's arguments are inapplicable. If, with respect to the

actual grants of real property interests at issue here, NPE continues to contend that the parties did

not use the right form of conveyance or grant of an estate in property, conveyances do not require

the talismanic recitation of certain magic words. Rather, North Dakota, like other states, recognizes

that a broad construction of the term "conveyance" is appropriate. *See, e.g.*, *Eakman v. Robb*, 237

N.W.2d 423, at 428 (N.D. 1975) ("Broad constructions have been placed on the term 'conveyance'

by courts in California, Montana, and Michigan." (citing *Barbieri v. Ongaro*, 208 Cal. App. 2d

753, 757 (1962) (holding that an agreement restricting subdivision of land was "'an instrument

affecting the title to real property'"))); *Wayt v. Patee*, 269 P. 660, 663 (Cal. 1928) (holding that an

agreement among landowners restricting land use was a 'conveyance' entitled to recording); *Kosel*

*v. Stone*, 404 P.2d 894, 897 (Mont. 1965) (agreeing with the *Wayt* holding, concluding that an agreement limiting certain land to residential use was a "conveyance").

NPE also fixates on the fact that the █████████ ████████████████████████ ████████ as evidence that the ████████ were not a grant of an estate. *See* First MSJ at 16-17. Of course, NPE makes this secondary argument in service of its primary strawman argument: that the ████████ as covenants cannot constitute themselves a grant of an estate. Caliber is not making that argument, and so it is unsurprising that language surrounding the ████████ relates to the Agreement and not the grantee of an estate in real property. The *In re Badlands* court, when faced with nearly identical language in the ████████ there (████████████████████ ████████████████████████████████████████) (emphasis in original) had no problem finding that they constituted covenants running with the land. *In re Badlands*, 608 B.R. at 864 ("[T]he Agreements are covenants that run with the land…"). *Id.* at 875. Accordingly, NPE's argument that Caliber was not a grantee misses the mark.

5.     The ████████████ *Directly Benefit—Touch and Concern—NPE's Mineral Leases in the* ██████████████

NPE's last argument regarding the ████████ status as covenants running with the land is that they do not "touch and concern" the land; *i.e.*, they do not provide a "direct benefit" to NPE's estate in real property. *See* First MSJ at 20-25. As was the case with the privity element, NPE explicitly conceded that the ████████ touch and concern ██████████████ ██████████████████████ 2018 MSAs § 10.1(a)(iii). But regardless of NPE's repeated attempts to run from its contractual agreements, the law makes this clear anyway.

While NPE contends that covenants running with the land must *both* burden its real property *and* benefit Caliber's, that is an incorrect statement of law. First MSJ at 21. This is confirmed by NPE's own quote from *Beeter*, a North Dakota Supreme Court case, which in turn

quoted a Washington case called *Mullendore*, both of which require only that the covenant "enhance [land]'s value and confer a benefit upon it," with no requirement of a concomitant burden. First MSJ at 20. Therefore, it is not necessary under N.D.C.C. § 47–04–26 that Caliber identify some burden for the ▆▆▆▆ to run as covenants with the land and NPE identifies no authority requiring it.[7]

Whether stated as a "directly benefit" or "touch-and-concern" requirement, the purpose of the test remains the same: does the covenant under consideration relate to real property or personal property? *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 623–24 (Utah 1989) ("The touch-and-concern requirement is critical in distinguishing between real and personal covenants.") (cited by *In re Badlands*, 608 B.R. at 868). "'*[A]ll that must be shown* for a covenant to run with the land is that it 'be of such character that its performance or nonperformance will so affect the use, value or enjoyment of the land itself that it must be regarded as an integral part of the property.'" *Id*. at 624 (quoting *Lundeberg v. Dastrup*, 28 Utah 2d 28, 497 P.2d 648, 650 (1972) (footnote omitted) (emphasis added)).

NPE first argues that Plaintiffs' "mineral estate" was not burdened "in any way," because ▆▆▆▆ and Caliber did not "obtain title over the mineral estate." First MSJ at 21. NPE inappropriately conflates real property with personal property. ▆▆▆▆ ▆▆▆▆ benefit or burden NPE's mineral estate interests.  NPE's mineral estates are "directly benefited" by the ▆▆▆▆ because the ▆▆▆▆ provide the entity owning the working interests the ability to take advantage of a custom-built midstream gathering pipeline system designed specifically for those working interests. Indeed, the ▆▆▆▆ induced Caliber

---

[7] NPE cites a treatise, *Powell on Real Property*, for this proposition.

to build out the midstream infrastructure that adds value to NPE's mineral interests. Acquirers or successors to NPE's working interests will not have to concern themselves with flaring restrictions, the lost value of natural gas or NGLs that must be flared at the wellhead, or any interruptions occasioned by the hazards of trucking in North Dakota due to the presence of the pipeline gathering system. Critically, the midstream infrastructure directly benefits the working interests by allowing the owner of those working interests to develop them and bring the resultant hydrocarbons to market.

Courts have similarly found that a covenant or ███████ n which adds value to real property constitutes a "direct benefit" for purposes of real covenant analysis. For example, the *Alta Mesa* court found that:

> The gathering agreements touch and concern the Alta Mesa oil and gas leases because both the benefits and the burdens of the covenants affect the value of Alta Mesa's real property interests. Kingfisher used its surface easement to build a modern gathering system for the dedicated wells, which enhances the value of Alta Mesa's leases. On the other hand, the gathering agreements impose costs and delivery restrictions on produced hydrocarbons, which diminish the value of Alta Mesa's unproduced reserves. Thus, there is a logical connection between both the burden and benefit of the covenants and Alta Mesas real property. This simple fact persists even though Kingfisher is not entitled to possession until after the hydrocarbons become personal property.

I*n re Alta Mesa*, 613 B.R. at 102. The same is true of the 2018 MSAs here, ███████████ ████████████████████████████████ diminishing the value of NPE's unproduced reserves and thereby burdening NPE's real property.

NPE then returns to a familiar refrain as it contends that: (1) because it explicitly reserved its rights to independently operate and develop its working interests how it saw fit without Caliber's interference, (2) the ██████████ affected only its ability to transport its "personal property," and (3) the ███████████████████████████████████, that somehow the Dedications did not burden its estate. *See* First MSJ at 22. These arguments, whether in the context

of privity (*see* Sec. II.3-4 *supra*) or touch and concern, miss the mark, because they misapprehend the property interests that NPE holds. NPE, makes the same mistake that the *Sabine* court—and the cases following and relying on *Sabine* such as *Grand Mesa* and *Southland*—do: they focus on a fee mineral estate, when "the relevant starting point is [NPE]'s leasehold interest." *In re Alta Mesa*, 613 B.R. at 103. Like the gathering agreements in *Alta Mesa*, the 2018 MSAs here

███████████████████████████████████████████████████████████████████████████

*Id*. (emphasis added).

As set forth above, *see* Sec. II.3 *supra*, before:

entering into the agreements, [NPE] possessed a bundle of rights that included the right to search for and reduce hydrocarbons to possession, surface easements for exploration and production, and other rights and privileges necessary for profitable production." *Id*. Of course, "[t]hose leasehold rights exist to facilitate the capture of hydrocarbons. *Sabine* drew a distinction between covenants concerning the surface estate and those that concern the mineral estate. That distinction is far from semantic. An oil and gas lease contemplates extraction of hydrocarbons for profit. All of the property interests associated with an oil and gas lease are necessary for the lessee to successfully explore and produce his reserves. Those leasehold interests, targeted at the production of hydrocarbons, are the real property interests which the [NPE] gathering agreements involve.

*Id*.

Once these real property interests of NPE are properly identified, it becomes clear that the

████████    touch and concern them. Just as was the case in *Alta Mesa*, the 2018 MSAs: (1)

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████    *Compare id*. at

103 *with* 2018 MSAs §§ 3 ████ , 10.1 ████████████████████████████████

████████████ , 14.1, 14.3 ████████████████

Here, the record undisputedly demonstrates that the real property interests held by NPE, leasehold interests in mineral estates, have been directly benefitted by the ███████ The property is directly benefitted by the ███████ because they provided the incentive for Caliber to invest hundreds of millions of dollars to design and build a pipeline infrastructure system to exploit the minerals in place; this directly benefits the working interests, oil and gas leases, and mineral leases that use the pipeline systems. *See In re Alta* Mesa, 613 B.R. at 103 ("Pursuant to the agreements, Kingfisher built a modern gathering system. That system was intended to benefit the oil and gas leases by facilitating the collection of produced reserves."). Like in *Alta Mesa*, NPE's interests in its lease reserves are burdened by the surface easements granted to Caliber as are its rights under the leases as otherwise it would have had the rights to seek a different gatherer or build its own midstream system, both of which are now restricted. *Id.*

In addition to the 2018 MSAs benefitting as well as burdening NPE's real property interests (i.e., affecting them), the gathering system, which Caliber constructed:

> in furtherance of the agreements, enhances the value of [NPE]'s unproduced reserves. Because the gathering system enhances the value of the reserves themselves, not simply [NPE]'s personal interest in the reserves, there is a logical connection between the covenant calling for the construction of the gathering system and the value of the reserves. [] Once a well is linked to an accessible gathering system, the system not only benefits the produced reserves as they travel towards collection, it enhances the value of unproduced reserves which may be extracted in the future. Just as a home without access to a road is less valuable than one facing the street, a solitary oil and gas lease is less valuable than one attached to a gathering grid. As a result of the gathering agreements, [NPE]'s current and future wells have access to a modern, efficient gathering system. The availability of the gathering system increases the value of [NPE]'s reserves because it reduces the transportation costs associated with future production.

*Id.* at 104.

And beyond directly benefitting NPE's real property interests, the ███████ also burden them as well. As discussed above, part of the bundle of rights NPE received in its working interests

were easements to develop the hydrocarbons. But the 2018 MSAs ██████████ ████████████████████████████████████████████ thereby reducing NPE's real property interest under the leases. Further, ████████████████████████████████ NPE's use of its reserves is restricted. While NPE originally had total discretion to gather and transport its hydrocarbons before entering into the 2018 MSAs—whether to use an existing system or build one itself—after entering into the 2018 MSAs, ████████████████████████ ██████████████████████████ (which its former parent had a hand in creating specifically to benefit NPE's predecessor TUSA). Thus, even though NPE, like Alta Mesa, "retained the right to determine whether and when to capture its mineral reserves," (First MSJ at 21-22), "it surrendered the right to determine what happens to the reserves once it drills." *In re Alta Mesa*, 613 B.R. at 104. Clearly, then, NPE's reserves suffered because it cannot now pursue a more favorable agreement. *Id*.

Finally, the ███████████████ present in the 2018 MSAs also "touch and concern" NPE's real property interests because they could, depending on market conditions, either depress or enhance the value of NPE's reserves. In a favorable market for an E&P company like NPE, the higher commodity prices in conjunction with ██████████████ like those in the 2018 MSAs could result in higher profits and, therefore, higher value property rights. By the same token, in a down market like this, the ███████████ clearly burden NPE's reserves because the products will be sold at a relatively lower price while the ██████████ will remain unchanged. As such, even though █████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ *Id.* at 104-05.

NPE then argues that the ███████ did not confer any benefit on the estate NPE granted to Caliber because, tautologically, Caliber was not granted any estate under the 2018 MSAs. First MSJ at 23-24. This argument was disposed of above. *See* Sec. II.3 *supra*. And the estate in real property conveyed by NPE to Caliber—those leasehold working interest rights to use the surface estate to access the wellheads and lay a pipeline to transport hydrocarbons—plainly is directly benefitted by the ███████. The ███████ require NPE, or the subsequent owner of NPE's working interests in the ███████, to use the Caliber pipeline gathering system, thereby "directly benefitting" Caliber's rights to lay pipelines and transport hydrocarbons. *See Self v. Sharafi*, 220 Cal. App. 4th 483, 490 (2013) ("The building restriction in the present case touches and concerns the land because it relates to the use of the restricted land. The restriction directly benefits [grantee's] property that [grantor] conveyed [] because it is the type of restriction that naturally enhances the market value of any property adjoining the restricted property.").

The fact that Caliber receives a payment for its services in the form of fees does not mean that the ███████ do not touch and concern the land. *See* First MSJ at 24. For example, in *Flying Diamond*, the agreement at issue provided that the surface estate owner would pay a 2.5% royalty "so long as it is receiving oil and/or gas production from or oil and/or gas royalties upon production from the described premises … of all the oil and gas and associated liquid hydrocarbons hereafter produced, saved, and marketed…" and that this promise was to be a covenant running with the land to be binding upon all successors and assigns. 776 P.2d at 621. After analyzing the touch-and-concern requirement, the court held that the promise to pay the 2.5% royalty was a covenant running with the land. *Id*. at 631. The court noted that covenants for the payment of money "may at first blush appear to be a personal covenant," but that such a promise could touch and concern the land when viewed in light of the parties' entire agreement. *Id*. at 625. The entire agreement

created various easements and surface rights in favor of the mineral estate owner (*id*.), just as the

2018 MSAs ████████████████████████████████████. And, just as in *Flying*

*Diamond*, those various rights were "designed to facilitate oil and gas exploration and production."

*Id*. Notably, the various easements and surface rights were "floating easements" that only came

into being as necessary for the exploration and production activities. *Id*. at 626.

The agreement in *Flying Diamond* also provided that the parties could not assign their

contractual rights without also transferring their property rights. *Id.* at 627 ("even the general right

to assign the entire Agreement … expressly precludes the separate assignment of the payments

apart from the surface ownership and hence negates the notion that the 2 ½ payment covenant is

personal"). Similarly, the 2018 MSAs permit ████████████████████████████████

████████████████████████████████████████████████████████

*See* 2018 MSAs 13.1(a) (████████████████████████████████████████

████████████████████████████████████. Critically, Caliber must ████████

████████████████████████████████████████████████████████

████████████████████████████████ thus negating the notion that the obligations

under the 2018 MSAs are personal. *See id*. The benefit of the service fees inure to the benefit of

whoever owns the property rights NPE granted to Caliber—████████████████████████

████████████████████████████████████████████████████████

████████████████—and provide them with value. This point is demonstrated by the fact that if

Caliber were to transfer the "sticks" that comprise its real property interests, the benefits of the

covenants in the ████████ would inure in favor of the party acquiring those "sticks" and would

provide no value to Caliber. The assignment provision would make no sense unless the ████████

were covenants that ran with the land. Those service fees do not benefit Caliber personally; rather,

31

they benefit the property rights owned by Caliber granted to it by NPE, and they would continue to benefit the property rights, even if Caliber conveyed those rights to a different party.

Similarly, the Fifth Circuit Court of Appeals in *In re Energytec, Inc.*, sat in review of a bankruptcy court order authorizing a sale of a pipeline system free and clear of Newco Energy's right to certain fees and other interests in the pipeline because those rights were not covenants running with the land. 739 F.3d 215, 217 (5th Cir. 2013). The Fifth Circuit reversed the bankruptcy court, finding that Newco's interest in the transportation fee from Energytec's pipeline, which arose out of agreements Newco made with Energytec's predecessor, were valid covenants running with the land. *Id*. The only issue before the Court was whether the so-called "touch-and-concern" requirement for a valid covenant had been met; a requirement roughly akin to North Dakota's "directly benefit" requirement. *Id*. at 221.

Ultimately, the Fifth Circuit rejected Energytec's argument that "the obligation to pay transportation costs is unrelated to the use of the land because it is based solely on the volume of gas moving through the pipeline and has no direct impact on the land," finding that the "real property at issue here is a gas pipeline system and the rights-of-way required for its placement." *Id*. at 224. Newco's interest in the transportation fees was for the use of real property "i.e., the traveling of natural gas from a starting point along the length of the pipeline to an endpoint," with the Fifth Circuit drawing an analogy equally applicable here: "The pipeline is a subsurface road for natural gas, and a fee for the use of that road was retained by [predecessor to Energytec] and assigned to Newco … These rights impact the owner's interest in the pipeline." *Id*. Critically, the fee rights, as burdens on the property "also impact the pipeline's value in the eyes of prospective buyers." *Id*.

The Court need not engage in a searching inquiry on the touch and concern prong. That the ███████ "touch and concern" NPE's real property interests (its working interest mineral leases) is obvious as NPE's real property interests are essentially its only valuable assets. NPE, as Debtors, are looking to quickly sell those assets in a section 363 sale. But, in order to achieve a higher price for those assets, NPE wants to rid itself of the 2018 MSAs it entered into just three years ago, including the ████████ included therein as covenants running with the land. If those ████████ did not "touch and concern" its interests by benefitting or, in NPE's apparent belief, burdening them, why would they be the subject of two summary judgment motions and a motion to reject.

Again, the *Alta Mesa* court put it best:

> Piecing these covenants together, their connection to Alta Mesa's real property is apparent. Although Kingfisher's right to delivery is conditioned upon extraction, its interest affects the reserves even as the hydrocarbons remain undisturbed. All interested parties know that if Alta Mesa decides to drill, the product must be delivered to Kingfisher. The Alta Mesa leases are burdened by the pledge to Kingfisher because the value of the unproduced reserves is decreased by the fixed gathering fees. This is precisely why Alta Mesa seeks to reject the gathering agreements. While Kingfisher's right to delivery springs at the instant when the reserves reach the surface and become personal property, its interest has touched and concerned Alta Mesa's mineral leases since the execution of the gathering agreements.

613 B.R. at 105. The same is true here.

## CONCLUSION

For the reasons set forth above, Caliber respectfully requests that the Court deny the First MSJ.

Dated: April 9, 2021
Wilmington, Delaware

*/s/ Taylor M. Haga*
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Curtis S. Miller (No. 4853)
Taylor M. Haga (No. 6549)
Nader A. Amer (No. 6635)
1201 N. Market St., 16th Floor
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
cmiller@morrisnichols.com
thaga@morrisnichols.com
namer@morrisnichols.com

*-and-*

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Perez (admitted *pro hac vice*)
Brenda L. Funk (admitted *pro hac vice*)
Tristan M. Sierra (admitted *pro hac vice*)
700 Louisiana, Suite 1700
Houston, TX 77022-2784
Telephone: (713) 546-5040
alfredo.perez@weil.com
brenda.funk@weil.com
tristan.sierra@weil.com

*-and-*

Edward Soto (admitted *pro hac vice*)
Lauren Alexander (admitted *pro hac vice*)
Corey D. Berman (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
edward.soto@weil.com
lauren.alexander@weil.com
corey.berman@weil.com

*Counsel to Caliber Measurement Services LLC, Caliber Midstream Fresh Water Partners LLC, and Caliber North Dakota LLC*

**<u>EXHIBIT A</u>**

**FILED UNDER SEAL**

**<u>EXHIBIT B</u>**

**FILED UNDER SEAL**

**<u>EXHIBIT C</u>**

**FILED UNDER SEAL**

## **<u>EXHIBIT D</u>**

**FILED UNDER SEAL**

**<u>EXHIBIT E</u>**

**FILED UNDER SEAL**

# EXHIBIT F

**FILED UNDER SEAL**